IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

COLLECTIVE BRANDS, INC., AND PAYLESS
SHOESOURCE, INC.,

          Plaintiffs,

          vs.                  Case No. 11-4097-JTM

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, P.A., *et al.*,

          Defendants.

MEMORANDUM AND ORDER

Through intermediaries, plaintiffs Payless ShoeSource and its owner, Collective Brands (here, collectively, "Payless") marketed their products to residents of California and Washington through telephone calls and text messages. The recipients of these communications brought class actions against Payless in both states, alleging violations of statutes limited unsolicited electronic communications, and which ultimately resulted in substantial settlements.

This is an action brought by Payless against its insurer National Union Fire Insurance Company, seeking damages for breach of contract and a declaration of coverage as to two underlying class *Clark v. Payless ShoeSource*, No. 2:09-cv-00915-JCC (W.D. Wash.) and *Kazemi v. Payless ShoeSource,* No. 3:09-cv-05142-MHP (N.D. Cal.). The case is now before the court on the Motions for Summary Judgment of Payless and Collective Brands (Dkt. 42) and National Union (Dkt. 49), as well as National Union's Motions to Stay or Transfer (Dkt. 40).

The court declines to stay the action, and finds that under the facts of the case and the clear language of the relevant policies, National Union owed no duty to defend the underlying actions, and grants summary judgment in favor of the defendant.

### *Findings of Fact*

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988).  The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985).  The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance.  *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs.  Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts.  "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475

U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*).  One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).


ShoeSource, headquartered in Topeka, Kansas, is a well-known retailer of footwear. ShoeSource is wholly owned by Collective Brands, which is also headquartered in Topeka, Kansas.

National Union is an insurance company, incorporated under the laws of the State of Pennsylvania, which has its principal place of business in the State of New York and which conducts business in the State of Kansas.

*Clark* was originally filed in Washington state court on June 2, 2009, and was removed to the United States District Court for the Western District of Washington on July 2, 2009. An Amended Complaint was filed in *Clark* on or about April 27, 2010.

Naming as defendants both Payless and its telemarketing vendor SmartReply, the *Clark* plaintiffs alleged, among other things, that Payless violated the TCPA and the Washington Automatic Dialing and Announcing Device statute ("WADAD"), Wash. Rev. Code § 80.36.400; and Wash. Rev. Code § 19.86, by having pre-recorded telephone messages delivered to various individuals through the use of an automated dialing device. *Clark* was purportedly brought on behalf of two classes of persons, defined as:

> All persons who received a prerecorded telephone message on their telephone from defendants sent by automatic dialing machine ("National Class"), at any time for the period that begins 4 years from the date of this complaint to trial; and

> All Washington persons who received a prerecorded telephone message on their telephone from defendants sent by automatic dialing machine ("State Class"), at any time for the period that begins 4 years from the date of this complaint to trial.

According to Payless, the calls at issue in *Clark* were made to provide information concerning upcoming sales and promotions to existing customers who had already supplied contact information. It allegedly believed that customers being called had agreed to be contacted and did not believe it was violating the TCPA or any other laws through such calls. The vendor making the calls had agreed, in its contract with Payless ShoeSource Worldwide, Inc., that it would "not infringe any intellectual property, privacy or other right of any person [and] comply with all applicable Laws, including without limitation the applicable federal, state and local Laws, including but not limited to all federal, state and local 'do not call' laws and regulations." Payless also cites *Cubbage v. The Talbots, Inc.*, No. C09-911BHS (W.D. Wash. July 7, 2010), in which the court granted summary judgment, dismissing similar claims for violations of the TCPA and WADAD.

National Union argues that the present case is distinguishable, noting that Payless conceded in *Clark* that the two lead plaintiffs had not given their home telephone numbers to Payless, and did not otherwise consent to receiving calls at home. However, the actual pleadings indicate that Payless's concession was more limited. It agreed that as to one lead plaintiff, it did not have an existing business relationship, but did have one with that plaintiff's wife, who had consented to calls at home. As to the other lead plaintiff, it stated that it was unable to locate evidence confirming any business relationship, and concluded that the plaintiff's home number "was provided to Payless by someone other than Mr. *Clark*, or that an error was made by the sales associate who input the number." Payless consistently took the position in *Clark* that the calls were made under a system designed to limit calls to customers who had consented to such marketing.

National Union denied coverage for defense and indemnification of *Clark* in 2010.

*Clark* has been settled. The settlement provided for certification of a settlement class consisting of "[a]ll persons in the State of Washington who received a prerecorded telephone message that SmartReply transmitted or caused to be transmitted for or on

behalf of Payless during the period of time June 2, 2005 through and including the Date of Settlement." Although the class period extended back to 2005 based on the allegations in plaintiffs' Complaint, the first call at issue in *Clark* was actually made in November 2007, and the last call was made in May 2009. The settlement, which was approved on July 27, 2012, does not contain any admission or determination that Payless intentionally caused injury, knowingly violated anyone's rights, or violated the TCPA.

Prior to entering into the settlement, Payless sought National Union's consent for the settlement. National Union refused to provide consent to the settlement and did not agree to accept any responsibility for defense of the action.

The costs incurred in connection with the defense and settlement of *Clark* include $3,190,550 in merchandise certificates; approximately $250,000 for claims administration costs; $35,000 in unreimbursed defense costs; $12,000 in payments to the named plaintiffs; $15,000 in mediator fees. In addition, Payless was obligated under the settlement 17. After taking account of a $525,000 contribution by SmartReply's insurers towards the settlement costs, the total incurred by Payless for defense and settlement of *Clark* is between $3,287,179.42 and $3,767,550, depending on whether the decision reducing the fee award stands and the ultimate amount of claims administration costs actually incurred.

*Kazemi* was filed on October 29, 2009 in the United States District Court for the Northern District of California. The *Kazemi* plaintiffs brought suit against Payless and its text marketing vendor, VMBC, and alleged, among other things, that Payless had violated the TCPA by sending purportedly unauthorized text message advertisements to various individuals' cellular phones. *Kazemi* was purportedly brought on behalf of a class consisting of:

> all persons in the United States who, within four years prior to the filing of this lawsuit, received one or more text messages from Defendants advertising Payless shoe promotions; provided however, that defendants and any officers or directors of defendants are excluded from the Class.

*Kazemi* was also purportedly brought on behalf of a subclass consisting of "all class members who received more than one text message from or on behalf of Defendants advertising Payless shoe promotions within any 12-month period."

According to Payless, the text messages at issue in *Kazemi* were intended by Payless to provide its existing customers, who had previously given contact information to Payless, information concerning upcoming sales and promotions. It believed that the customers receiving the text messages had agreed to be contacted and did not believe it was violating the TCPA or any other laws through such text messages. As with the telemarketing vendor in *Clark*, the vendor in *Kazemi* contracted with Payless Worldwide to send text messages "in accordance with all applicable federal, state, and local laws and regulations, including but not limited to all telemarketing and consumer laws."

National Union seeks to controvert these contentions by noting Kazemi's statement that after receiving the first text message he had called Payless to state that he was on the national Do Not Call registry, and asked to be put on the company's Do Not Call list. Payless notes that Kazemi also admitted that he had previously given his telephone number to Payless while he was checking out.

National Union denied coverage for defense and indemnification in *Kazemi* in 2010.

*Kazemi* has been settled. (*Kazemi* (Second Corrected) Settlement Agreement (Andrews Aff. Ex. 15.) The settlement agreement, which was approved on April 2, 2012, provided for certification of a settlement class consisting of "all persons who received one or more SMS [Short Message Service] text messages from or on behalf of Payless ShoeSource, Inc. during the period from October 29, 2005 through October 4, 2010." Although the class period in *Kazemi* extended back to 2005 based on the class period set forth in the Complaint, the first text message at issue in the case actually occurred in April 2008. The last text message occurred in June 2009. The *Kazemi* settlement does not include

any admission or determination that Payless intentionally caused injury, knowingly violated anyone's rights, or violated the TCPA.

Prior to entering into the settlement, Payless sought National Union's consent for the settlement. National Union refused to provide consent to the settlement and did not agree to accept any responsibility for defense of the action.

The *Kazemi* settlement provided that Payless would be required to issue at least $5,000,000, but no more than $6,000,000, in merchandise certificates to class members or through *cy pres* contributions. Based on the claims submitted, Payless will only be required to issue a total of $5,000,000 in merchandise certificates. Thus, the costs incurred in connection with the defense and settlement of *Kazemi* include $5,000,000 in merchandise certificates issued to class members or through *cy pres*; $159,000 for claims administration costs; $740,000 in unreimbursed defense costs; $5,000 in payments to the named plaintiff; $29,790 in mediator fees; and $1,250,000 for plaintiffs' attorney fees. The total amount incurred by Payless for defense and settlement of *Kazemi* is thus $7,183,890.

From February 1, 2007 until the Underlying Actions were filed in 2009, Zurich American Insurance Company was Payless's primary general liability insurer. Zurich issued three primary policies to Payless:

| Policy Number | Policy Period |
|---|---|
| GLO 5918469-01 | February 1, 2007 to February 1, 2008 |
| GLO 5918469-02 | February 1, 2008 to February 1, 2009 |
| GLO 5918469-03 | February 1, 2009 to February 1, 2010 |

The Primary Zurich Policies, unlike the National Union Policies, contain an exclusion that applies whenever an action or omission "violates or is alleged to violate" the TCPA or other communications laws. Thus, the Zurich exclusionary language, applicable both to Property Damage and to Personal and Advertising Liability, provides that:

This insurance does not apply to:

DISTRIBUTION OF MATERIAL IN VIOLATION OF STATUTES

7

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

a. The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

b. The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

c. Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

National Union was Payless's umbrella excess insurer. Its Policies provide coverage for liability exposures which are excluded under the Primary Zurich Policies but are not excluded under National Union's umbrella coverage. National Union issued the following policies to Payless:

| Policy Number | Policy Period |
|---|---|
| BE 983467 | February 1, 2007 to February 1, 2008 |
| BE 9835528 | February 1, 2008 to February 1, 2009 |
| BE 2227231 | February 1, 2009 to February 1, 2010 |

The National Union Policies provide coverage for liability due to Advertising Injury and Property Damage resulting from an Occurrence. Section I of the National Union Policies "Insuring Agreement - Commercial Umbrella Liability," states in part:

A. We will pay on behalf of the Insured those sums in excess of the Retained Limit that the Insured becomes legally obligated to pay as damages by reason of liability imposed by law because of Bodily Injury, Property Damage or Personal Injury and Advertising Injury to which this insurance applies or because of Bodily Injury or Property Damage to which this insurance applies assumed by the Insured under an Insured Contract. The amount we will pay for damages is limited as described in Section IV. Limits of Insurance.

B. This policy applies, only if:

1. the Bodily Injury or Property Damage is caused by an Occurrence that takes place anywhere, and the Bodily Injury or Property Damage occurs during the Policy Period; and

2. the Personal Injury and Advertising Injury is caused by an Occurrence that takes place anywhere arising out of your business, but only if the Occurrence was committed during the Policy Period.

8

Section III of the National Union Policies define the insurer's duty to defend, and provide:

A. We will have the right and duty to defend any Suit against the Insured that seeks damages for Bodily Injury, Property Damage or Personal Injury and Advertising Injury covered by this policy, even if the Suit is groundless, false or fraudulent when:

   1. the total applicable limits of Scheduled Underlying Insurance have been exhausted by payment of Loss to which this policy applies and the total applicable limits of Other Insurance have been exhausted; or

   2. the damages sought because of Bodily Injury, Property Damage or Personal Injury and Advertising Injury would not be covered by the Scheduled Underlying Insurance or any applicable Other Insurance, even if the total applicable limits of either the Scheduled Underlying Insurance or any applicable Other Insurance had not been exhausted by the payment of Loss.

   * * *

B. We will have no duty to defend the Insured against any Suit seeking damages for Bodily Injury, Property Damage or Personal Injury and Advertising Injury to which this insurance does not apply.

Section VII of the National Union Policies "Definitions," defines "Occurrence" as follows:

S. Occurrence means:

   1. as respects Bodily Injury or Property Damage, an accident, including continuous or repeated exposure to substantially the same general harmful conditions. All such exposure to substantially the same general harmful conditions will be deemed to arise out of one Occurrence.

   2. as respects Personal Injury and Advertising Injury, an offense arising out of your business that causes Personal Injury and Advertising Injury. All damages that arise from the same, related or repeated injurious material or act will be deemed to arise out of one Occurrence, regardless of the frequency or repetition thereof, the number and kind of media used and the number of claimants.

The Policies define "Personal and Advertising Injury":

U. Personal and Advertising Injury means injury arising out of your business, including consequential Bodily Injury, arising out of one or more of the following offenses:

      1. false arrest, detention or imprisonment;

9

2. malicious prosecution;

3. the wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies committed by or on behalf of its owner, landlord or lessor;

4. oral or written publication, in any manner, of material that slanders or libels a person or organization, or disparages a person's or organization's goods, products or services;

5. oral or written publication, in any manner, of material that violates a person's right of privacy;

6. the use of another's advertising idea in your Advertisement; or

7. infringement upon another's copyright, trade dress or slogan in your Advertisement.

The Policies define "Property Damage" to mean

1. physical injury to tangible property, including all resulting loss of use of that property. All such loss of use will be deemed to occur at the time of the physical injury that caused it; or

2. loss of use of tangible property that is not physically injured. All such loss of use will be deemed to occur at the time of the Occurrence that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

The Policies also provide that National Union will have the "duty to defend any Suit against the Insured that seeks damages for Bodily Injury, Property Damage or Personal Injury and Advertising Injury covered by this policy, even if the Suit is groundless, false or fraudulent."

The National Union Policies contain exclusions for "Property Damage expected or intended from the standpoint of the Insured," and for Personal Injury and Advertising

10

Injury that is "caused by the Insured with knowledge that its act would both violate the rights of another and would inflict Personal Injury and Advertising Injury."

In addition, the National Union Policies contain the Exclusion for Violations of Communications. Exclusion W provides:

**Violation of Communication or Information Law**

This insurance does not apply to any liability arising out of any act that violates any statute, ordinance or regulation of any federal, state or local government, including any amendment of or addition to such laws, that prohibits or limits the sending, transmitting or communicating of material or information.

The National Union Policies provide coverage, subject to a $25,000 retention per Occurrence and a $25 million limit, for matters which are covered by the National Union Policies but not by the Primary Zurich Policies.

By letters dated September 16, 2010 and October 21, 2010, National Union issued its coverage position declining to extend coverage for both Underlying Lawsuits on the basis that neither lawsuit seeks damages because of "bodily injury," "property damage," or "personal injury and advertising injury" caused by an "occurrence," as those terms are defined in the National Union policies

The National Union Policies were issued to Payless in Kansas, where Payless is headquartered. National Union attempts to controvert this fact, observing that the Declarations Pages of the policies provide an Downers Grove address for Collective Brands, and Kansas City, Missouri and Chicago, Illinois addresses for Lockton Companies, Payless's insurance broker. But National Union provides no information indicating that the policies were delivered outside of Kansas, or that contradicts the affidavit evidence of Payless that the policies were actually issued in Kansas.

***Motion to Stay***

As noted earlier, in addition to its Motion for Summary Judgment, National Union has also filed a Motion to Stay or Transfer, premised on the "first to file" doctrine. Prior to the commencement of this action on August 18, 2011, National Union had previously instituted an action against Payless and Collective Brands in the Northern District of California (No. 11-01892-EMC) on April 19, 2011. The first-to-file rule is a reflection of the inherent power of each court to stay its own proceedings. *See Ed Tobergate Assocs. v. Zide Sport Shop*, 83 F.Supp.2d 1197, 1198 (D. Kan. 1999). "[W]hile the first-to-file rule is generally enforced by the first court, 'the second district court has discretion to transfer, stay, or dismiss the second case in the interest of efficiency and judicial economy.'" *Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.*, 679 F. Supp. 2d 1287, 1297 (D. Kan. 2010) (quoting *Cedars-Sinai Med. Ctr. v Shalala*, 125 F.3d 765, 769 (9th Cir. 1997)).

National Union argues (Dkt. 41, at 5-6) this court should adopt the August 9, 2012 determination of Judge Chen in the California action, holding that first to file rule was applicable to the action, and that its prior filing was free from any taint of forum shopping, anticipatory filing, or bad faith. (Order, at 8-10). The court finds that Judge Chen's decision does not support a stay of the action. Rather, that decision, and the underlying facts of the case, support the resolution of the issues by this court.

First, while Judge Chen generally acknowledged the first-to-file doctrine, he appropriately determined in his August 9 Order that this case was exceptional in light of the relative posture of the cases.

> In this case, the Kansas litigation has already proceeded to the initial discovery phase, which is scheduled to conclude on August 10, 2012, leading to briefing dispositive motions commencing on August 31, 2012.... In contrast, this action remains in its infancy with no substantive motions having come before this Court. In comparison to the incipient nature of this case, the Kansas litigation is more developed with that court having invested greater of time and resources into the matter than this Court. It would be presumptuous for this Court to enjoin the Kansas litigation given its relative progress relative to the instant case.

2012 WL 3277222, at *9.

After denying Nation Union's attempt to enjoin the Payless and Collective from proceeding with this action, those parties then moved to stay further proceedings in the present action. Judge Chen granted the motion to stay the California case on August 31, 2012.

> In the Kansas Court, things have proceeded in an orderly way under a scheduled fashion, including a control of discovery in the Kansas matter. So I think there is a difference, and I do think the Kansas matter has proceeded further along than this Court, and it doesn't make sense from a judicial economy perspective to continue to litigate both actions which are very much overlapping and have two courts hear two motions that will obviously have implications for one another. And so what I'm going to do is stay this action pending a disposition of the motion to stay in Kansas.... I think it's clear if the Kansas Court denies that motion to stay and continues down the path of adjudicating on a scheduled matter on a schedule, the motion for summary judgment, then the stay here will continue. So, essentially, I'm going to defer to the Kansas Court in light of its advanced stage.

Further, although he had determined in his first Order that National Union's action was not anticipatory, Judge Chen acknowledged that he had not considered some evidence, discussed below, which could support such a finding.

This court finds that the motion to stay should be denied for two reasons. First, as Judge Chen observed, the matter is substantially more advanced in this action. In this action, the parties have fully briefed dispositive motions pursuant to a formal Scheduling Order. The period for initial discovery has passed. In the California action, no discovery requests have been served, and no schedule for dispositive motions has been set. The only motion that has been filed was an unscheduled summary judgment motion filed on August 31, 2012 — well after Judge Chen declined to stay this action, and only a few hours before he ultimately decided to stay the action in California.

The first-to-file rule is not a formalistic talisman, but a practical rule premised on the conserving "economy of time and effort for itself, for counsel, and for litigants." *Asmann v. Dairy Farmers of America*, No. 12-1060-KHV/DJW, 2012 U.S. Dist. LEXIS 47210, at *3 (D. Kan. Apr. 4, 2012). Here, in light of the substantially greater advancement of this action and

the nature of case (a dispute as to insurance coverage which is particularly suited to resolution by dispositive motion), those interests are supported by resolution of the dispute in Kansas.

Second, there is a substantial basis for finding that National Union's California action was anticipatory. After months of settlement negotiations between the parties, Nation Union filed its California declaratory judgment action on April 19, 2011. This action was filed only a single day after Payless and Collective Brands wrote to the National Union with a time-sensitive settlement offer, coupled with the statement that they were considering impleading National Union in the underlying class action.

Further, National Union's counsel later acknowledged that the California action was filed in anticipation of being independently brought into court. In a May 3, 2011 e-mail, National Union notified Payless and Collective Brands:

> Because of our concern that joinder in the Washington case could potentially subject us to piecemeal resolution of our dispute... we have commenced a declaratory judgment action in the Northern District of California....

National Union has presented no alternative explanation for the sudden filing of the California action. It does, however, emphasize the delay of several months before the Payless and Collective Brands instituted the present action in Kansas. But this may be understood in light of the parties negotiations, the plaintiffs presenting communications during the interim in which National Union held out the hope of a settlement, but on the explicit condition that the plaintiffs not "commence any action ... in any other jurisdiction in connection with the claims in this action."

In sum, the court finds that interests of judicial economy do not support a stay where discovery has been completed and dispositive motions are ripe for resolution. Further, National Union's equitable interests in a resolution in its chosen forum are minimal in light of the timing of its action, its anticipatory nature, and its failure to raise

the issue of a stay in a timely fashion. Accordingly in its discretion, the court denies the request for a stay.

Further, the court denies National Union's request to transfer the action to California. In considering a motion under 28 U.S.C. § 1404(a), the court considers

> the plaintiff's choice of forum; the accessibility of witnesses and other sources of proof, including the availability of compulsory process to insure attendance of witnesses; the cost of making the necessary proof; questions as to the enforceability of a judgment if one is obtained; relative advantages and obstacles to a fair trial; difficulties that may arise from congested dockets; the possibility of the existence of questions arising in the area of conflict of laws; the advantage of having a local court determine questions of local law; and[ ] all other considerations of a practical nature that make a trial easy, expeditious and economical.

*Chrysler Credit Corp. v. Country Chrysler*, 928 F.2d 1509, 1516 (10th Cir.1991) (internal quotation marks omitted). "[U]nless the balance is strongly in favor of the movant[,] the plaintiff's choice of forum should rarely be disturbed." *Id.* at 965 (internal quotation omitted).

Here, none of the relevant facts support transfer. National Union in fact acknowledges that the are no witnesses or sources of proof in California, and that the fairness of trial in Kansas or California is not an issue.(Dkt. 41, at 11-12). The court finds that practical considerations support resolution of the action in Kansas. This leaves only the issue of the correct choice of law. Payless and Collective Brands argue that Kansas law should prevail. (Dkt. 52, at 29); National Union argues California law should control. (Dkt. 41, at 11 n. 4). In either event, this court can appropriately resolve any questions of law, and the balance of factors does not support, let alone "strongly" support transfer of the action.

### Choice of Law

The parties dispute which law should govern the action. Payless argues that Kansas law should govern, as Kansas follows the doctrine of *lex loci contractus,* and the contract was formed in this State. *See, e.g., Hartford Accident & Indem. Co. v. American Red Ball Transit*

*Co.*, 938 P.2d 281, 1285 (1997). Citing *Aselco Inc. v. Hartford Ins. Group*, 28 Kan.App.2d 839, Syl. ¶ 7, 21 P.3d 1011, *rev. denied* 272 Kan. 1417 (2001) (applying law of place of performance to decide whether insurer had a duty to defend), National Union argues that its duty to defend the *Clark* and *Kazemi* actions must be determined under California and Washington law, as the places where the performance of its defense under the contract would have been performed.[1]

In *Moses v. Halstead*, 581 F.3d 1248, 1253-54 (10th Cir. 2009), the Tenth Circuit recognized the problematic state of Kansas choice of law rules governing insurance contracts:

> Kansas courts have struggled in determining whether questions raised in cases before them are governed by the law of the place of performance or the place where the contract was made. *See Layne Christensen Co.* [*v. Zurich Canada*, 30 Kan. App.2d 128], 38 P.3d [757,] at 766-67 (comparing *Novak v. Mutual of Omaha Ins. Co.*, 29 Kan.App.2d 526, 28 P.3d 1033 (2001), applying *lex loci contractus* when determining validity of contract provision, and *Aselco, Inc. v. Hartford Ins. Group*, 28 Kan.App.2d 839, 21 P.3d 1011 (2001), applying performance rule on duty to defend issue and lex loci contractus to contract interpretation issue).
> ....
> In *Aselco*, a panel of the Kansas Court of Appeals held that where an insurance company's performance of its duty to defend takes place in Kansas, Kansas law governs the determination of the existence of such duty. *See Aselco*, 21 P.3d at 1018. But *Aselco* neither cited to any Kansas cases nor offered any analysis for its holding. *See id.* Moreover, *Aselco* so held despite admitting that it was not required to reach the governing law issue because it was not raised in the trial court. *See id.*
>
> A few months later in *Novak*, another panel of the Kansas Court of Appeals, including one of the judges on *Aselco*, declined to follow *Aselco* to apply the place of performance rule. 28 P.3d at 1039. The court held that the law of the place where the contract was made governed the validity of the one-year limitations provision in the contract. *See id.* The panel noted that "[a]lthough some Kansas conflicts cases have involved issues of performance, few cases have used the place of performance rule to resolve contract choice of law decisions." *Id.* at 1039 (citing cases).

---

[1] Alternatively, it argues that even if the court uses the rule of *lex loci contractus*, either Missouri or Illinois law should apply. Citing *Layne Christensen*, 30 Kan.App.2d at 144 ("the place of contracting is where the policy is posted or delivered to the broker"), National Union notes that the policies provide an addresses in these states for Payless's insurance broker. Based upon the affidavits submitted by Payless, however, the uncontroverted facts establish that the policies were actually delivered to Payless in Kansas.

Further, the Court noted the failure of the *Aselco* court to actually engage with the authority it invoked, Restatement (First) of Conflicts of Law, § 358 (1934).

> *Aselco* stated that "[b]ecause [the insurance company's] performance of its duty to defend would have taken place in Kansas, Kansas law governs the determination of the existence of the duty." *Aselco*, 21 P.3d at 1018. *Novak* relied on the fact that an overwhelming majority of Kansas Supreme Court and Court of Appeals cases have applied the law of place of contracting. *See Novak*, 28 P.3d at 1039. In *Layne Christensen Co.*, however, a case decided a few months later by the same panel that decided *Aselco*, the court provided further guidance on what question to ask in applying the Restatement. *See Layne Christensen Co.*, 38 P.3d at 766-67 (holding that the meaning of the coverage limit is governed by the law of place of contracting because it goes to the substance of obligation). In *Layne Christensen Co.*, the court acknowledged the *Novak* and *Aselco* panels' struggles in applying the law of the place of performance versus the place of contracting. *See id.* at 766. It did not endorse either outcome. Instead, it followed Kansas Supreme Court precedent adopting the test set out in the Restatement and provided guidance based on section 358, Comment b. This test focuses on whether the question before the court goes to the substance of the obligation or the manner of performance. *See Layne Christensen Co.*, 38 P.3d at 767 (citing *Simms v. Metropolitan Life Ins. Co.*, 9 Kan.App.2d 640, 685 P.2d 321 (1984) and 4 Holmes' Appleman on Insurance 2d, Conflicts and Choice of Law, § 21.5 p. 274-75 (1998)). Unlike *Layne Christensen Co.*, neither *Novak* nor *Aselco* analyzed whether the question before them went to the substance of the obligation or the manner of performance.

581 F.3d at 1253.

The court finds that *Aselco*, which was decided without reference to prior case law, does not countermand the clear weight of Kansas cases adopting *lexi locus contractus* for defining the scope of contractual obligations. As the Tenth Circuit observed in *Moses v. Halstead*, the Restatement itself recognizes that distinction between place of contracting and place of performance may be formalistic and unhelpful. Comment b to § 358 of the Restatement provides;

> there is no logical line which separates questions of the obligation of the contract, which is determined by the law of the place of contracting, from questions of performance, determined by the law of the place of performance. There is, however, a practical line which is drawn in every case by the particular circumstances thereof. When the application of the law of the place of contracting would extend to the determination of the minute details of the manner, method, time and sufficiency of performance so that it would be an unreasonable regulation of acts in the place of performance, the law of the place of contracting will cease to control and the law of the place of performance will be applied. *On the other hand, when the application*

> *of the law of the place of performance would extend to a regulation of the substance of the obligation to which the parties purported to bind themselves so that it would unreasonably determine the effect of an agreement made in the place of contracting, the law of the place of performance will give way to the law of the place of contracting.*

(Emphasis added).

Here, the dispute between the parties exists as to whether National Union had *any* duty *at all* to defend *Clark* and *Kazemi*, not whether it performed that duty but perhaps did so inadequately. Accordingly, the existence of the duty to defend must be resolved by the law of Kansas, as the place where the contract of insurance was formed.

*Coverage*

Payless argues that the claims in *Clark* and *Kazemi* fall within two coverage provisions in its policies with National Union: the provision for Advertising Injury and the provision for Property Damage. The policies define advertising injury to include "oral or written publication, in any manner, of material that violates a person's right of privacy." The policies define property damage to include both physical injury to tangible property, as well as the "loss of use of tangible property that is not physically injured."

National Union, premising its argument on California and Washington law, argues that the Advertising Injury provision does not apply, since *Clark* and *Kazemi* do not include any allegation that Payless published private information to the public or to third parties. Thus, in *State Farm General Insurance v. JT's Frames*, 181 Cal.App.4th 429 (Cal.Ct.App. 2010), the court held that unsolicited faxes which violated TCPA did not fall within an advertising injury clause, because the information published was not private or secret information. *See also St Paul Fire & Marine Insurance v. Onvia, Inc.*, No. C06-105RSL, 2007 WL 564075, *5 (W.D. Wash. Feb. 16, 2007), *aff'd*, 208 WL 5077281 (9th Cir. 2008). Further, National Union argues that the Property Damage clause has no application, because the sending of the

18

faxes was an intentional act, and thus not an occurrence within the terms of the policy. *See JT's Frames*, 181 Cal.App.4th at 449-50.

The court finds that the claims advanced in the underlying litigation falls within both the Advertising Injury and Property Damage clauses of the policy. National Union's motion for summary judgment is entirely dependent on its assumption that the California and Washington law govern the action. As noted earlier, the court finds that Kansas law governs the issue of whether National Union had a duty to defend Payless. Applying that law, it is clear that it did.

In *Park University Enterprises v. American Cas. Co. of Reading*, 442 F.3d 1239 (10th Cir. 2006), the Tenth Circuit, applying Kansas law, held that alleged violations of the TCPA fell within both the Advertising Injury and Property Damage provisions of the plaintiff's insurance policy. In doing so, the court rejected the arguments advanced here by National Union. The court found that the insurer's argument that the Advertising Injury protected against the public disclosure of private information rather than simple intrusion upon seclusion was "not entirely unreasonable." 442 F.3d at 1248. However, Kansas law requires the policy to be construed following "what a reasonable person in the position of the insured would have understood [it] to mean." Id. (quoting *Casey v. Aetna Cas. & Sur.*, 205 Kan. 495, 470 P.2d 821, 826 (1970)). The court agreed with the district court that the term "publication" should be broadly construed "as making something generally known [or which] communicated information generally." Id. at 1250. The court also found coverage was implicated under the Advertising Injury clause, even if the unsolicited faxes did not reveal secrets of the recipient.

Park also held that the unsolicited faxes in violation of the TCPA could also fall within the insurance policy's provision for Property Damage, because the plaintiff in the underlying case "lost the use of its fax machine, ink, and paper."*Id.* at 1244. As in the present case, the insurer argued that the alleged injuries were not covered as Property

Damage because they were not an accidental occurrence, but intentional. The insured argued, however, that it did not intend to cause any harm to the recipients. The Tenth Circuit agreed with the insurer that a duty to defend existed, since the insured had presented evidence showing that it believed the recipients had agreed to the faxes:

> We agree with the district court that the distinction under Kansas law between intent to act and intent to injury is dispositive in this case. *See Spruill Motors* [*v. Universal Underwriters Ins.,* 212 Kan. 681, ] 512 P.2d [403,] 408 [(1973)].... When Park University sent the fax to J.C. Hauling, it thought it had permission to do so. Hence, from its standpoint, any resulting use of J.C. Hauling's fax machine, paper, and toner could not have resulted in injury because Park University thought that the fax was welcome.

Id. at 1246.

National Union suggests that no loss of use occurred here, because the communications here were telephone calls and text messages, rather than faxes. The court finds the distinction is not so decisive as to preclude the duty to defend. Congress noted in passing the TCPA that an automated telephone connection can effective seize a telephone line, releasing it only after the recipient hangs up or the message is played. H.R. Rep. No. 102-317(1991). Further, the text message function on many older cell phones require the user to manually respond or delete them before otherwise using the phone. It is, of course, *possible* that all of the recipients of the text messages in *Kazemi* were owners of newer smart phones which permit continued usage of the phone despite the receipt of an unwanted fax. The duty to defend, however, is not negated by a mere possibility of noncoverage; it arises "whenever there is a potential of liability under the policy." *Spivey v. Safeco Insurance*, 254 Kan. 237, 856 P.2d 182, 188 1993).

*Exclusion*

As noted earlier, the policies explicitly exclude coverage for any liability predicated on violations of electronic communications laws, such as TCPA.

> This insurance does not apply to any liability arising out of any act that violates any statute, ordinance or regulation of any federal, state or local

20

government, including any amendment of or addition to such laws, that prohibits or limits the sending, transmitting or communicating of material or information.

National Union argues that this provision is clearly applicable to the TCPA and other statutory claims in *Clark* and *Kazemi*, and accordingly it had no duty to defend Payless in those cases. Contrasting this exclusion with other exclusions in the National Union policies, and with the underlying Zurich policy which exclude liability for actual or alleged claims, Payless argues that the exclusion only applies if the liability is actually adjudicated. Since it settled the underlying actions and never conceded any intentional violation of TCPA, it contends, the duty to defend remained in effect.

The court rejects Payless's argument, finding the electronic communication exclusion excludes coverage by its own, unambiguous terms. Here, the exclusion provides that "[t]his insurance does not apply to any liability arising out of any act" violating a communications statute. Nothing in the exclusion requires a formal adjudication of liability; it is sufficient if the liability arises from statutory violations. The plaintiffs in *Clark* and *Kazemi* alleged precisely such statutory violations, and liability arose from those allegations.

Under Kansas law, the duty to defend only if there is a "potential of liability under the policy." *Spruill Motors v. Universal Underwriters*, 512 P.2d at 407. The plaintiffs in *Clark* and *Kazemi* alleged statutory violations of TCPA and other statutes, and any judgment affirming their claims would have necessarily brought the liability within statutory communications exclusion. There was never any chance of coverage in light of the exclusion, there was no duty to defend.

Payless's reliance on the explicit use of the term "alleged" in other exclusions, and in the underlying Zurich policy, is misplaced. First, the plaintiffs' argument has little weight it itself. In the relevant examples such as the Professional Liability exclusion, the "alleged" language actually supports the inference that the "any liability" preface to the

21

exclusions should be read to include claims as well as adjudications. More importantly, such constructions are unnecessary. The court considers the language of exclusions separately, and resorts to broader principles of construction only if the exclusion at issue is ambiguous. *See Biebel Bros. v. United States Fid. & Guar.*, 522 F.2d 1207, 1212 (8th Cir. 1975).

Similarly, the intentional act cases cited by Payless are inapposite. *See, e.g., Spruill Motors*, 512 P.2d at 408). In those cases, the existence of an intentional act exclusion does not preclude a duty to defend if the insurer learns of a facts suggesting a non-intentional injury. Here, in contrast, the exclusion broadly precludes "any liability" which "arises from" the violation of a communications statute. The plaintiffs in *Clark* and *Kazemi* predicated their claims on precisely those sort of statutes. the insurer has a duty to defend claims.

Similarly, the plaintiffs' reliance on *Gray v. Zurich Insurance,* 65 Cal.2d 263, 419 P.2d 168 (Cal.1966) — and *Gowring v. Great Plains Mut Ins.*, 483 P.2d 1072, 1074 (Kan. 1971), which applied *Gray* in Kansas — is also misplaced. In *Gray,* the court held that a duty to defend existed where there was both ambiguity with respect to an intentional act exclusion and a general provision that the insurer would provide a defense against even "groundless false or fraudulent" claims.

The policies here include a provision that National Union would defend against groundless claims, but this promise only extends to coverage "to which this insurance provides." Here, the communications statute explicitly prevents such provision. To the extent *Gray* is relevant, it is in its observation that insurance policies must be construed bearing in mind the risk understood by the parties:

> Here the policy insures against 'damages because of bodily injury.' As we have pointed out, in view of the language of the policy, the insured would reasonably expect protection in an action involving alleged bodily injury. On the other hand the insured could not reasonably expect protection under an automobile insurance policy for injury which occurs from defect in a stairway. Similarly an insured would not expect a defense for an injury

involving an automobile under a general comprehensive policy which excluded automobile coverage.

65 Cal.2d at 274-75, 419 P.2d at 175.

Here, the policy unambiguously excluded coverage for liability arising from the violation of a communications statute, and Payless could not reasonably expect coverage for such liability.

### *Unpled Common Law Allegations*

Finally, Payless argues in the alternative that National Union owed a duty of defense because the plaintiffs in *Clark* and *Kazemi might* have advanced claims for common law privacy invasion, which would not have implicated the Violation of Communication Statutes.

Of course, the plaintiffs in those case made no actual common law privacy claims, which require different — and more egregious — underlying conduct, in comparison to the TCPA and related statutory claims. *See Hernandez v. Hillsides*, 47 Cal.4th 272 (2009) (common law privacy claim requires "highly offensive" intrusion which results in an "egregious breach of the social norms"); *Adams v. King County*, 164 Wash.2d 640, 662, 192 P.3d 891, 902 (2008) (invasion of privacy requires "publication of a private matter that would be highly offensive to a reasonable person"); *Fisher v. State*, 125 Wash.App. 869, 106 P.3d 836 (2005) (tort of invasion by intrusion requires a deliberate intrusion ... into a person's solitude, seclusion, or private affairs ... with the certain belief that the result would happen"); *Lopez v. City of Seattle* , 113 Wash.App. 1049 (2002) (following RESTATEMENT (SECOND) OF TORTS, § 652B (1977) in requiring that intrusion be "highly offensive to a reasonable person").

While, as noted earlier, the duty to defend exists whenever there is a potential for liability, this duty is contingent upon the claims actually advanced in the underlying litigation. Payless has submitted no authority for the principle that an insurer must offer

23

a defense based on hypothetical claims which have been deliberately eschewed by the real world plaintiffs. *See Michaelian v. State Compensation Ins. Fund*, 50 Cal.App.4th 1093, 1106 (1996) (liberal construction of underlying pleadings does not require speculation as to unpled claims).

In Kansas, the insurer must start with the pleadings and further assess any other "reasonably discoverable facts" demonstrating a possibility of coverage. *Miller v. Westport Ins.*, 288 Kan. 27, 35, 200 P.3d 419, 425 (2009). But here the plaintiffs in the underlying actions relied exclusively on straightforward claims of statutory violations — claims which fall directly within an explicit policy exclusion — and avoided any claim for common law invasion of privacy. Further, they made no factual allegations, and Payless has not pointed to any additional readily discoverable facts, demonstrating "highly offensive" conduct necessary to support such common law privacy claims,

Because the class claimants in *Clark* and *Kazemi* never presented any claim for common law invasion of privacy, and their complaints presented no factual allegations supporting such claims, the claims were properly viewed as purely statutory. National Union had no duty to defend the underlying actions.

### *Conclusion*

The court finds that the present matter should not be stayed. It finds that coverage for the allegations in *Clark* and *Kazemi* were at least provisionally implicated by the Property Damage and Advertising Injury provisions of the policies, but that coverage was nonetheless excluded by the plain terms of the Violation of Communication Statutes Exclusion. Accordingly, taking account of the actual allegations and claims in the underlying litigation, National Union had no duty to defend Payless in those actions. As the duty to defend is broader than the duty to indemnify, under the facts of the case the court's determination is also dispositive as to Payless's claim for breach of the duty to

indemnify, *see Miller v. Westport Insurance*, 288 Kan. 27, 33, 200 P.3d 419, 423-24 (2009);
*Certain Underwriters of Lloyd's, London v. Superior Court*, 21 Cal. 4th 545 (Cal. 2001) ("where
there is no duty to defend there cannot be a duty to indemnify"), and Payless's claims
premised on each duty are subject to summary judgment. The plain text of the exclusion
for breach of communications law precludes coverage and the obligation to defend under
the facts of the case, and the defendant's motion for summary judgment is granted.

IT IS ACCORDINGLY ORDERED this 4th day of January, 2013, that the plaintiffs'
Motion for Summary Judgment (Dkt. 42) is denied; defendant's Motion to Stay (Dkt. 40)
is denied; defendant's Motion for Summary Judgment (Dkt. 49) is granted.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE